**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CITY OF TROY,

        Defendant.

_____/

Case No. 19-cv-12736

Honorable Nancy G. Edmunds

**ORDER AND OPINION ON**
**MOTIONS FOR SUMMARY JUDGMENT [45] [46]**

This case is a companion to *Adam Community Center v. City of Troy*, No. 18-cv-13481, in which the complainant, Adam Community Center, alleges that the City of Troy, among others, violated its rights under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc-2000cc-5, ("RLUIPA"), as well as the First, Fifth, and Fourteenth Amendments to the United States Constitution by, primarily, implementing and imposing a land use regulation that places a burden on the religious exercise of the Islamic Adam Community Center and treats it differently from similar, secular institutions.

After Adam Community Center filed its complaint, the United States brought the present case against the City of Troy. The United States alleges that the Troy zoning ordinance violates the Equal Terms Provision of RLUIPA and imposes a substantial burden on Adam Community Center's religious exercise in violation of RLUIPA. (ECF No. 1.) The matter is now before the Court on fully briefed cross motions for summary judgment. (ECF Nos. 45, 46, 48, 50, 53, 54.) The Court, having reviewed the extensive briefing in this matter, finds that a hearing is not necessary. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons stated below, the City of Troy's Motion for Summary Judgment is DENIED, and the United States' Motion for Summary Judgment is GRANTED.

1

I.      **BACKGROUND**

A.      **The City of Troy's Zoning Ordinance**

The City of Troy, ("City" or "Troy"), is a municipality located within the State of Michigan. It has enacted a comprehensive set of zoning ordinances that govern the use and development of real property located within its borders (the "ZO"). In 2011, Troy updated the ZO according to a revised Master Plan. ECF No. 45-2, PageID.1319. The overall purpose of the ZO is now to "promote and safeguard the public health, safety, and welfare [and] implement the City of Troy Master Plan." ZO § 1.03. It further strives to "promote and regulate growth," "protect the character and stability of residential neighborhoods," "promote the wise use and conservation of energy and vital natural resources," "improve the appearance and design quality of development," "prevent an unreasonable burden on public facilities and services," "lessen and avoid [traffic] congestion . . . and provide safe and convenient access for property," and "conserve the taxable value of land, buildings, and structures in the City of Troy." *Id.*

The ZO divides Troy into 22 zoning districts, each with permitted uses and dimensional and other restrictions for buildings. *See* ZO § 4.01, ECF No. 8, PageID.49, 52. Uses within each district are labeled as "permitted as of right," "requiring special approval," "accessory," or "not permitted." *Id.*, ZO § 4.21. The ZO also prescribes "setbacks" which are required distances between buildings and property lines ("setback standards"), and regulates parking in these setbacks ("parking standards"). The setback standards and parking standards address concerns related to traffic on adjacent streets, people's safety accessing buildings, and secondary impacts on nearby properties such as noise or light. *See, e.g.*, ECF No. 45-2, PageID.1352; ECF No. 45-3, PageID.1468, PageID.1473.

The general setback and parking standards apply to the uses that are permitted as of right in each district. *See, e.g.*, ZO §§ 4.14 C, D.4. But the ZO imposes different standards on certain uses ("use-specific standards") that supersede general standards wherever that use is located. *See* ZO Art. VI; ECF No. 45-2, PageID.1353. According to Troy, use-specific standards are "designed to minimize negative impact(s) [certain] uses may have on surrounding property." ECF No. 46, PageID.2098.

One land use that Troy subjects to use-specific setback and parking standards is "places of worship."[1] ZO § 6.21. Troy's Community Development Director states that "places of worship present unique potential negative impacts on a community" due to the significant number of visitors and the traffic influxes which occur during short periods of time and on a regular basis. ECF No. 46, PageID.2099. This creates the potential for increased noise, light, and exhaust fumes, as well as busy thoroughfares and parking access points. ECF No. 45-11, PageID.1706.

The ZO allows places of worship to operate in 16 districts within Troy—six districts as of right (1-General Business, 2-Community Business, 3-Integrated Industrial and Business, 4-Office, 5-Office Mixed Use, and 6-Research Center) and ten districts with special approval (Community Facilities district and nine residential districts). ZO § 4.21. This amounts to approximately 97% of the land area in the City of Troy. ECF No. 45-11, PageID.1705. Through all districts, there are approximately 60 places of worship within the City, though none of these are Islamic mosques. ECF No. 45-3, PageID.1520. The City lacks a permanent location for Islamic worship. ECF No. 45-19, PageID.1851.

---

[1] The City defines "places of worship" as "site[s] used for or intended for the regular assembly of persons for the conducting of religious services and accessory uses therewith." ZO Art. 2.

3

In the six districts that allow places of worship as of right, Troy imposes the following general setback and parking standards:

| District | Minimum Setback Requirements and Parking Restrictions | | | | |
|---|---|---|---|---|---|
| | Front | Rear | Sides | Adjacent to Residential | Parking Restrictions in Setback Areas |
| Community Business | 10' | 30' | 20'* | 75' | ≤ 50% of front; not within 10' of residential or public street |
| General Business | 10' | 30' | 20'* | 75' | ≤ 50% of front; not within 10' of residential or public street |
| Integrated Industrial & Business | 30' | 20' | 10' | 50' | Not in front; not within 10' of residential or public street |
| Office | 10' | 30' | 20' | 50' | ≤ 50% of front; not within 10' of residential or public street |
| Office Mixed Use | 10' | 30' | 20'** | 50' | ≤ 50% of front; not within 10' of residential or public street |
| Research Center | 30' | 20' | 20' | 50' | Not in front or by public street; not within 10' of residential |
| *No setbacks are required where the lot abuts a non-residential lot unless the property's related wall has windows; a minimum 10' setback is required where the property's wall has windows or openings. **In the Office Mixed Use district, the sum total of both side setbacks must be at least 60 feet | | | | | |

ECF No. 45, PageID.1279; ECF No. 8, PageID.57-58, ¶¶ 65-70. These setback and parking standards apply to nonreligious assemblies and institutions allowed by right in these districts, including conference, meeting and banquet facilities; mortuary/funeral homes; fine and performing art facilities; primary and secondary schools; restaurants; and theaters and places of assembly. *Id.* The general standards do not apply to places of worship as these are expressly subject to the use-specific setback and parking requirements found in ZO §§ 6.21(E)-(F).

The use-specific setback standards require places of worship to maintain a minimum 50-foot setback on every side of the building, regardless of neighboring uses. *See* ZO § 6.21. Parking standards for places of worship are also use-specific—parking is completely prohibited in any setback adjacent to a public street or residential property (setback and parking standards are collectively, "place of worship standards"). *Id.*; ECF No. 8, PageID.49-

4

50, ¶ 20. These place of worship standards apply to all places of worship in each district where they are permitted. *Id.*

The ZO also treats places of worship differently from other uses in Troy's Community Facilities district, where it requires places of worship to apply for and obtain a special use permit before using a property. *See* ZO § 4.21. According to the City, the Community Facilities district is "intended to provide areas for those public, quasi-public, or private institutional and service uses necessary to serve the cultural, educational, and physical needs of the community." ZO § 4.11. Thus, institutions such as fine and performing arts facilities, primary and secondary schools, and public owned or operated office and service facilities may operate by right in the district, without obtaining a permit. *Id.*

Years ago, when Troy first imposed the place of worship standards, places of worship were located primarily within residential districts and always required special approval to operate. ECF No 45-2, PagieID.1322; ECF No. 8, PageID.49-50. But Troy's 2011 ZO rewrite changed this to allow places of worship to operate "as of right" in the six districts discussed above. The place of worship standards, however, did not change with the ZO's rewrite. According to Troy's Community Development Director, Troy carried the place of worship standards over to all districts in 2011 without "a lot of thought," because they "seemed to be functioning very well." ECF No. 45-2, PageID.1323.

## B.    Dimensional Variances From The ZO

Troy's Zoning Board of Appeals ("ZBA") may grant dimensional variances from general or use-specific standards in the ZO "where a literal enforcement of [its] provisions . . . would involve practical difficulties . . ." ZO § 15.04(E)(1). Any variance granted must be "the minimum necessary" and a variance is forbidden if "a different solution not requiring a variance would be possible." ZO § 15.04(E)(4). To obtain a variance, an applicant must

5

present substantial evidence to show, essentially, that (1) "exceptional characteristics" of the property make compliance with the requirements more difficult than it would for most properties in that district; (2) the proposed variance will not be harmful or dangerous, change the "essential character of the area" or negatively affect the surrounding area or property values; and (3) the "characteristics which make compliance with dimensional requirements difficult" are "related to the premises for which the variance is sought," (4) not "of a personal nature," and (5) were not "created by a current or previous owner." ZO § 15.04(E)(2).

Troy has granted variances from setback and parking standards to nonreligious uses at least 35 times, including 13 with significant relief. *Id.*, PageID.1740-41, 43. In 2012, Troy reduced a 75' setback from a residential property to 10' for an office building, and in 2018, it allowed parking for a restaurant in three front setbacks where the ZO only allowed parking in the side or rear. *Id.* Troy has also relaxed place of worship standards in the past. *Id.* 26 n. 66. Places of worship have received variances that reduced (1) a setback abutting a residence from 50' to 26'3" and (2) front, side, and rear setbacks by 22.' *Id.* Troy has also approved parking within 50' of residences abutting a church. *Id.*, PageID.1745; ECF No. 45-5, PageID.1789. Notably, at least 35 places of worship in Troy do not currently adhere to place of worship standards. ECF No. 45-4; ECF No. 45-25.

The ZBA may choose to grant a variance with conditions that ZBA members feel are "in harmony with the spirit" of the ZO and "so that public safety and welfare [are] secured and substantial justice is done." ZO § 15.04(E)(1). Conditions can include requirements on landscaping or traffic studies. *Id.* 26 n. 66. If necessary, the ZBA may also postpone a decision after a public hearing in order to review additional information. *Id.* Variances with conditions have been approved by the ZBA in the past, including on at least one place of

worship, where variance criteria would not otherwise have been met. ECF No. 45-12, PageID.1747.

### C.   Adam Community Center

#### 1. *Background and Search for a Permanent Location*

Adam Community Center ("Adam") is a religious non-profit organization based in the City of Troy. Formed in 2009, Adam's goal is to establish a religious organization that would serve the Muslim community in Troy. ECF No. 45-16, PageID.1793. Establishing a mosque in Troy where the City's Muslim population can come together as one community is central to Adam's mission. *Id.* Because Adam members believe that five daily prayers are required by their faith, and that performing those prayers in fellowship at a mosque enhances spiritual benefits, Adam asserts that a convenient central location is necessary to suit its members' religious requirements. ECF No. 45-18, PageID.1847; ECF No. 45-16, PageID.1793. Adam's founders and members also seek a location where they can implement their own vision of services and programs they would like to offer the community. ECF No. 45-16, PageID.1793.

In 2012, Adam members began meeting in the basement of a business owned by one of its founders. *Id.* This was always intended to be a temporary location as the basement is too small to meet Adam's needs for worship services and religious education,[2] and the basement cannot be expanded to provide more space to accommodate Adam's community. *Id.*, PageID.1794. Since Adam began offering services in this building, some members have

---

[2] According to one Adam member, the basement is not an appropriate space because (1) it does not provide adequate space for men and women to pray separately, as Islam requires; (2) the space is very uncomfortable during larger events and is too tight to accommodate the number of attendees; (3) there is insufficient space for all members to complete wudu, an obligatory ritual washing before prayer; (4) there is not enough space for sufficient tables and chairs during guest speaker events so most members must sit on the ground; and (5) the space is too small to hold many events such as weddings, funerals, graduation parties, and religious celebrations for children. ECF No. 45-19, PageID.1852.

left the program because they did not feel comfortable in the windowless basement or, in the case of elderly or disabled members, because they had trouble accessing the lower floor. ECF No. 45-18, PageID.1848; ECF No. 45-19, PageID.1853. Additionally, the building does not meet the zoning requirements that Troy imposes on places of worship because the parking lot extends to within a few feet of a residential property. *Id.* Adam has therefore been searching since 2009 for a suitable permanent location to serve its approximate 200 families. ECF No. 45-16, PageID.1793; ECF No. 45-17, PageID.1802. This has proven to be quite difficult because of the zoning requirements Troy imposes on places of worship and the fact that Troy is almost 100 percent developed. ECF No. 45-3, PageID.1477; ECF No. 45-19, PageID.1854.

In 2013, Adam purchased a former restaurant to use as a "community center" under the ZO. ECF No. 45-19, PageID.1854. Troy initially approved Adam's use of this property without the need for variances. *Id.* After being notified that Adam members planned to hold prayer services at the property, however, Troy held a public hearing which culminated in the re-designation of Adam as a place of worship under the ZO. *Id.* This required Adam to seek variances for the property it purchased. *Id.* Before the variance process was complete, the property was sold to a different buyer. *Id.*

Following the sale of the proposed community center, Adam began investigating at least six other available properties in the City, but each place they considered was unsuitable for one reason or another. *Id.* When Adam finally found a former church for sale in 2018, the owners refused to sell the property to Adam despite Adam's above-asking price offer to purchase. *Id.* The property was ultimately purchased by a developer for substantially less money than Adam had offered. ECF No. 45-17, PageID.1809. Adam members became quite disheartened as they continued to spend their time and money to find a permanent location

8

without results. *See* ECF No. 45-16, PageID.1794 (noting that each time Adam members pursued a property, it took time away from other obligations and that the preparation of applications and site plans can amount to thousands of dollars).

### 2. The Subject Property

In the spring of 2018, Adam members found and entered into a purchase agreement for a conveniently-located property in Troy that would adequately suit Adam's religious needs (the "Property"). ECF No. 45-19, PageID.1854; ECF No. 53-1. The Property is in Troy's General Business district, which allows places of worship as of right, and had most recently been used without a zoning variance as a restaurant with a banquet hall. ECF No. 45-19, PageID.1854; ECF No. 45-2, PageId.1373.

The Property setbacks are such that any use permitted by right (*i.e.*, publicly owned and operated recreational facilities, primary and secondary schools, fine and performing arts facilities, post-secondary schools, and bus stations, among other things) could operate at the Property as long as it had sufficient parking, did not change the parking or physical structure, and was not subject to use-specific standards. ECF No. 45-9, PageID.1642. But the Property does not meet the more stringent use-specific setback and parking standards imposed on places of worship (*i.e.*, 50-foot setbacks on all sides with no parking allowed in setbacks abutting public streets or residential property). ECF No. 8, PageID.50. On its east side, the Property borders Rochester Road with an approximate 40-foot front setback. ECF No. 8, PageID.50. Opposite this, on the west side, the Property borders residential properties with another approximately 40-foot setback. *Id.* The two remaining sides border a commercial property with no setback to the north and commercial and residential properties with an approximate 118-foot setback to the south. *Id.* Parking extends into the setback areas that abut the public road and private residences. *Id.*, PageID.52. Thus, because Adam

is a religious organization and not a similar secular institution, it needs to obtain a variance from the ZBA in order to utilize the building for Adam's intended purpose. *See* ECF No. 45-2, PageID.1374 (asserting that if Adam was a place of assembly and not a place of worship, it would not need a variance).

### 3. Adam's Application For a Variance

Adam entered into a purchase agreement for the Property and applied for the necessary setback and parking variances. ECF No. 53-2, PageID.2979; ECF No. 45-21. In its application, Adam proposed to use the Property for several ancillary uses including a library, gymnasium, youth recreation center, conference center, and banquet hall. ECF No. 45-11, PageID.1706; ECF No. 45-21. Its members "thought it was very likely" the variance application would be approved since Adam had no plans to change the exterior of the building[3] or the parking lot and because Adam's use of the building would not be much different from its prior use as a restaurant and banquet hall. ECF No. 45-16, PageID.1794; ECF No. 45-19, PageID.1855. Additionally, several nearby properties and other places of worship in Troy have similar setbacks. ECF No. 45-19, PageID.1855.

Troy reviews each variance application to "make sure that it is complete enough" for the ZBA. ECF No. 45-9, PageID.1619. Adam revised its application based on this review. ECF No. 45-15, PageID.1778. Troy never told Adam that its application would be denied. ECF No. 45-19, PageID.1855. On June 19, 2018, the ZBA held a public hearing on Adam's application. ECF No. 8, PageID.54. Adam expected approval and explained why it believed it satisfied the variance criterion—the building's exterior and parking area would not change; Troy permits places of worship as of right in that district; nearby commercial buildings have

---

[3] Demolishing and rebuilding or altering the building would either leave Adam members with too little space for its needs or be cost prohibitive. ECF No. 45-16, PageID.1794.

similar relevant configurations; Adam planned to maintain the same building occupancy that Troy approved in 2012; and because Adam secured the support of a neighboring property owner. *See, e.g.*, ECF No. 45-21: ECF No. 45-22. Adam also told the ZBA that it should consider RLUIPA when making its decision.[4] ECF No. 45-22, PageID.1989-90.

During the hearing, ZBA members raised concerns about traffic and parking safety, and one neighbor questioned noise levels. *See generally*, ECF No. 45-22. When asked, Adam stated that it would not serve alcohol or increase noise in the area. *Id.* Adam and others also explained that peak use times would not coincide with heavy traffic and that Adam would not increase or fully use the Property's existing parking. *Id.* A Troy official clarified for the ZBA that the building could be used for commercial purposes without requiring a variance and that it was currently being used as a commercial entity. *Id.* One ZBA member asked for clarification regarding the impacts of RLUIPA, but Troy's Assistant City Attorney replied that the ZBA did not need to be concerned with RLUIPA. *Id.*

The ZBA made its decision that night without postponing or asking for additional information such as a traffic study or proposed conditions Adam could follow if it were granted a variance. *Id.* The ZBA unanimously denied Adam's variance request stating that the request "did not fit the intent and purpose" of the lot and that Adam's required 100 percent side setback variance on the side of the building that bordered the commercial property was "too aggressive." *Id.*

Because Adam cannot use the Property as a place of worship, it still meets in the basement of the office building owned by one of its members. After Troy's variance denial, Adam assigned its right to purchase the Property to Haji Alliance, a corporate entity owned

---

[4] As discussed in detail below, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") was enacted by Congress to protect individuals, houses of worship, and other religious institutions from discrimination in zoning and landmarking laws. *See* 42 USC §§ 2000cc, *et seq.*

by Adam members. ECF No. 53-3, PageID.2986. Adam then secured and as needed, renewed an option to lease the Property from Haji Alliance. ECF No. 53-4, PageID.2989. To offset costs of holding the building pending a decision from the ZBA, and this litigation, one Adam member continued to use the Property as a restaurant and banquet hall. ECF No. 45-19, PageID.1855. During that time period, the building was the site of several large parties including birthdays, weddings, fundraisers, and at least one event with over 200 attendees. *Id.* These uses were consistent with the ZO and did not surpass the building's capacity limitation. *Id.* The restaurant closed due to Michigan's mandatory COVID-19 pandemic closures and financial hardships have since prevented its reopening. *Id.*, PageID.1856.

### D.    This Litigation

On November 8, 2018, Adam initiated a lawsuit against the City of Troy, the ZBA, and other municipal departments as well as individuals associated with the denial of Adam's variance application (the "companion case"). *See Adam Community Center v. City of Troy, et al.*, Case No. 18-13481, ECF No. 1 (E.D. Mich. Nov. 8, 2018). The United States (the "Government") filed the present case against the City of Troy shortly thereafter. (ECF No. 1.) The Government alleges in its Complaint that the City of Troy's actions as described above violated the "Substantial Burden" and "Equal Terms" provisions of RLUIPA. ECF No. 1, PageID.31-32. It further alleges that the ZO itself violates RLUIPA as it does not treat religious assemblies or institutions on equal terms with nonreligious assemblies and institutions. *Id.*

Before the Court are the parties' cross motions for summary judgment. The Government moves for summary judgment on its Substantial Burden claim and its facial Equal Terms claim, but not its as-applied Equal Terms claim. *See* ECF No. 45,

PageID.1268-1269, n.1. Troy moves for summary judgment on all three of the Government's claims.

## II.    LEGAL AUTHORITIES

### A.    Summary Judgment Standard

"Summary judgment is proper only if the moving party shows that the record does not reveal a 'genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting FED. R. CIV. P. 56(a)).  A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In addition, once the moving party has met its burden, the non-moving party must make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 503 (6th Cir. 2017).  The non-moving party must present some evidence in support of its complaint to defeat a motion for summary judgment and show that a genuine issue for trial exists—*i.e.*, that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 248.

### B.    The Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc-2000cc-5, ("RLUIPA"), was enacted by Congress to protect

13

individuals, houses of worship, and other religious institutions from discrimination in zoning and landmarking laws.[5] Before its passage, Congress was presented with evidence that the ability to gather for worship and religious exercise was often hindered by state and local government decisions. *See* H.R. Rep. No. 106-219, 18-24 (1999); 146 Cong. Rec. 16698 (2000). Addressing this evidence, Senators Edward Kennedy and Orrin Hatch noted the following in their joint statement issued upon the bill's unanimous passage:

> Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.

> Sometimes, zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church, especially in cases of black churches and Jewish shuls and synagogues. More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.' Churches have been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic. Churches have been denied the right to meet in rented storefronts, in abandoned schools, in converted funeral homes, theaters and skating rinks—in all sorts of buildings that were permitted when they generated traffic for secular purposes. . . .

> This discrimination against religious uses is a nationwide problem.

*See id.* (joint statement of Sens Hatch and Kennedy). RLUIPA now aims to prevent this discrimination.

---

[5] RLUIPA also protects the religious exercise of institutionalized persons. *See* 42 U.S.C. § 2000cc-1. This is not relevant here.

III.    **ANALYSIS**

A.    **Standing**

Before the Court can address the parties' arguments on the merits, it must address Troy's concerns regarding standing. *See T.H.E. Ins. Co. v. Naghtin*, 916 F.2d 1082, 1084 (6th Cir. 1990) ("Standing is a threshold inquiry which we must consider prior to reaching the merits of [a case]"). Troy argues that the Government cannot assert its Substantial Burden or Equal Terms claims because Adam lacks a property interest in the Property and therefore does not have standing under RLUIPA. ECF No. 48, PageID.2520-2521.

By its terms, the protections of RLUIPA extend to religious institutions only when they have "an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. §2000cc-5. In the companion case, this Court clarified that RLUIPA only requires a plaintiff to have "a legally recognized property interest in the property." *Adam Cmty. Ctr. v. City of Troy*, 381 F. Supp. 3d 887, 904 (E.D. Mich. 2019) (citing *Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Charter Twp.*, No. 12-CV-10803, 2015 WL 1286813, at *7 (E.D. Mich. Mar. 20, 2015)). At the time, the Court denied without prejudice the defendants' motion to dismiss for lack of standing because Adam sufficiently alleged that it had an interest in the property such that it was entitled to bring the claims asserted in its complaint. *Id.*

Now, the Government has produced evidence sufficient to show Adam's continuing legal property interest in the Property. *See* ECF No. 53-2; ECF No.53-4; ECF No. 53-4. Adam entered into a purchase agreement for the Property on March 30, 2018. ECF No. 53-2. After Troy's variance denial, Adam assigned its right to purchase the Property to Haji Alliance, a corporate entity owned by Adam members. ECF No. 53-3. Adam then secured and as needed, renewed an option to lease the Property from Haji Alliance. ECF No. 53-4.

Thus, standing for Adam to bring its claims has been established. The Government also has independent authority to bring an action to enforce compliance with RLUIPA. 42 U.S.C. § 2000cc-2(f). Troy's motion is therefore denied with respect to its arguments on standing.

**B.   RLUIPA Facial Equal Terms Claim**

Under RLUIPA's Equal Terms Provision, localities are forbidden from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The Government claims that Troy's ZO violates RLUIPA's Equal Terms Provision in two ways. ECF No. 45, PageID.1291. First, it asserts that the ZO singles out places of worship by imposing more restrictive use-specific setback and parking standards. *Id.* Second, the Government points out that the ZO requires places of worship to apply for special use approval in the Community Facilities district while nonreligious assemblies and institutions are permitted to operate in the district by right. *Id.* Troy does not dispute the ZO's "special restrictions" imposed on places of worship, but argues that these restrictions present no significant barrier as there are several places of worship throughout the City and places of worship are permitted in almost all City districts. ECF No. 48, PageID.2515. Furthermore, Troy argues that the special restrictions are justified as places of worship result in "unique negative impacts on a community and neighboring properties." *Id.*

The Sixth Circuit interpreted RLUIPA's Equal Terms Provision in *Tree of Life Christian Schs. v. City of Upper Arlington*, 05 F.3d 357, 367 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 2011 (2019) ("*Tree of Life III*").[6] There, the Court determined that a plaintiff must provide

___

[6] *Tree of Life III* involved a facially-neutral zoning ordinance, resulting in an "as applied" Equal Terms claim. The Sixth Circuit has not addressed a facial claim. The Government supports the application of the Ninth Circuit's facial test which would put the burden on Troy "to show that the treatment received by [Adam] should not be deemed unequal, where it appears to be unequal on the face of the ordinance." *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1173 (9th Cir. 2011); ECF No. 45, PageID.1292 n. 12. Troy asserts that *Tree of Life III* applies equally to facial and as-applied claims and that other circuits' caselaw is not

16

evidence of the following elements to make a prima facie case under RLUIPA's equal terms provision: "(1) the plaintiff [is] a religious assembly or institution, (2) subject to a land use regulation, that (3) treats the [plaintiff] on less than equal terms, [compared] with (4) a nonreligious assembly or institution." *Tree of Life III*, 905 F.3d at 367 (quoting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1307–08 (11th Cir. 2006)). Once the plaintiff makes a prima facie case, the burden of persuasion shifts to the defendant to show that the bases on which the plaintiff established its prima facie case are not supported by a preponderance of the evidence. *Tree of Life III*, 905 F.3d at 370 (citing 42 U.S.C. § 2000cc-2(b)).

### 1.   There is Sufficient Evidence to Support a Prima Facie Case

The Government makes a prima facie case here. Elements one and two are easily met as there is no dispute that Adam is a "religious assembly or institution" that is subject to Troy's ZO, "a land use regulation" under RLUIPA. Troy only takes issue with elements three and four which are analyzed via comparators—that is, "similarly situated" nonreligious assemblies and institutions. *See Tree of Life III*, 905 F.3d at 368-69; ECF No. 48, PageID.2522. The Government asserts that relevant comparators are those with similar impacts on traffic, safety, and neighboring properties. ECF No. 45, PageID.1294-95. Specifically, the Government compares places of worship to conference, meeting, and banquet facilities; mortuary/funeral homes; fine and performing art facilities; primary and secondary schools; restaurants that regularly host large events; and theaters and places of assembly. *Id.* at 1295. Troy argues that places of worship are not similarly situated to any of these places, but provides no alternate comparators. ECF No. 48, PageID.2527.

---

binding. ECF No. 48, PageID.2522. Because Plaintiffs prevail under both the *Tree of Life III* standard and the more lenient Ninth Circuit standard, this Court need not address whether the Sixth Circuit would likely adopt the Ninth Circuit's facial test.

To determine what comparators are similarly situated, the comparison must "be conducted with regard to the legitimate zoning criteria set forth in the municipal ordinance in question." *Tree of Life III*, 905 F.3d at 369. This zoning criteria, Troy argues, can be found in the ZO's overall purpose section which provides that the purpose of the ZO is to "promote and safeguard the public health, safety and welfare" and "implement the Master Plan." ECF No. 48, PageID.2524 (quoting ZO § 1.03). Further, Troy argues, "[e]xpress individual purposes in Troy's zoning ordinance include protecting "the character and stability of residential neighborhoods," providing "transitions between land uses to reduce potential negative impacts" and to "lessen and avoid congestion on highways and streets, and provide safe and convenient access for property." *Id.*

Troy reliance on the zoning criteria applicable to the ZO as a whole rather than that "set forth in the municipal ordinance in question" is in error. *See Tree of Life III*, 905 F.3d at 369. In *Dorman v. Charter Twp. of Clinton*, another court in this district considered which "legitimate zoning criteria" applied when the applicable district's zoning ordinance plainly treated religious institutions differently, but the purpose of the ZO "as a whole" was nondiscriminatory. *Dorman v. Charter Twp. of Clinton*, No. 15-CV-12552, 2019 WL 3322352, at *4 (E.D. Mich. July 24, 2019). There, the court found that "the specific ordinance provision, and not the code as a whole" had imposed the relevant restriction so it was logical to treat that specific ordinance provision as the relevant "land use regulation." *Id.*

Sixth Circuit caselaw supports this result. In *Tree of Life Christian Schools v. City of Upper Arlington*, 823 F.3d 365 (6th Cir. 2016) ("*Tree of Life II*"), a religious school sought to use an office building to operate a religious school in a zoning district where religious schools were not permitted. *Id.* at 367. The school sought to rezone the property, and the defendant city denied the rezoning application. *Id.* at 368. The school then filed suit claiming the zoning

18

ordinance violated RLUIPA's Equal Terms provision. *Id.* at 366-67. The defendant argued that even if the religious school could not locate in the specific district where the property was located, it could "locate elsewhere in 95% of the land that exists in [the city]." *Id.* at 373. The Sixth Circuit rejected that argument explaining that "it is not a defense that a government discriminates against religious assemblies and institutions only in part, rather than all, of its jurisdiction." *Id.*

As in *Dorman*, and in line with the Sixth Circuit's reasoning in *Tree of Life II*, the Court here finds the relevant "legitimate zoning criteria" is that which applies to the specific district at issue. Thus, places of worship must be treated on equal terms with nonreligious institutions that are similarly situated with regard to the legitimate zoning criteria of each individual district. Those similarly situated institutions may vary across districts, but would consistently be those allowed to operate by right that have similar impacts on traffic, safety and neighboring properties—schools, theatres, banquet centers and similar assemblies where large groups of people come and go at set times. *See River of Life Kingdom Ministries v. Vill. Of Hazel Crest*, 611 F.3d 367, 373 (7th Cir. 2010) (finding that, with respect to traffic, "a church is more like a movie theater, which also generates groups of people coming and going at the same time"); *New Life Ministries v. Charter Twp. of Mt. Morris*, No. 05-cv-74339, 2006 WL 2583254, at *5 (E.D. Mich. Sept. 7, 2006) (finding private clubs, civic and fraternal organizations, lodge halls, theaters, assembly halls, and public and private educational facilities and institutions "gather and meet with similar frequency" as religious assemblies). Indeed, Troy's own ZO groups places of worship with schools and funeral homes due to their similar "function, character, and intensity." See ZO § 5.03(A)(1), Table 5.03-A-1.

In every district where Troy allows places of worship to operate, it permits at least one nonreligious assembly use with similar impacts on traffic, safety, and neighbors to

operate under less restrictive setback and parking standards. *See* ECF No. 45, PageID.1282. Each of these districts have their own legitimate zoning criteria, but the place of worship use-specific standards apply equally throughout the districts without regard to any district-specific zoning objectives. These place of worship standards, which are more restrictive on their face than the general setback and parking standards of each district, therefore plainly treat places of worship on less than equal terms with nonreligious assemblies and institutions. *See e.g.*, ECF No. 45-9, PageID.1618 (acknowledgement by the City of Troy that the place of worship standards are more restrictive than general standards that do not require 50-foot setbacks on each side). For example, in the General Business district, a nonreligious community center (or banquet hall, funeral home, theatre, *etc.*) could operate by right from a building meeting general setback standards—10 feet to the front, 30 feet to the rear, and 20 feet on each side—without a variance. But because ZO § 6.21 imposes a 50-foot setback standard on places of worship, a religious entity, regardless of size, would need variances for all sides. If that building abutted a single-family home with a 75-foot setback, the community center could have parking as close as 10 feet from the property line. But a religious entity would need a variance to have parking within 50 feet of the property line. Thus, the Government makes its prima facie case on this claim and the burden of persuasion shifts to the City of Troy to show that the bases on which the Government established its prima facie case are not supported by a preponderance of the evidence. *See Tree of Life III*, 905 F.3d at 370 (citing 42 U.S.C. § 2000cc-2(b)).

Similarly, the Government makes its prima facie case on its facial Equal Terms claim regarding the requirement that places of worship apply for and obtain a special permit to operate in the City's Community Facilities district. *See* ZO § 4.21. The stated purpose, *i.e.*, "legitimate zoning criteria," *Tree of Life III*, 905 F.3d at 369, of  the Community Facilities

district is "to provide areas for those public, quasi-public, or private institutional and service uses necessary to serve the cultural, educational, and physical needs of the community." ZO § 4.11. The ZO does not define "cultural" or "educational" but religious assemblies and institutions easily fall within the common understanding of each of these terms. *See, e.g.*, CULTURE, Black's Law Dictionary (11th ed. 2019) ("The beliefs, customs, and folkways shared and accepted by people in a given society"). So do institutions such as fine and performing arts facilities, recreational facilities, and primary, secondary, and post-secondary schools, but all of these uses are permitted by right while places of worship require special use approval. ZO § 4.21. The Community Facilities ZO therefore treats places of worship on less than equal terms with similar nonreligious uses with respect to the zoning criteria of the district.

### 2. *Troy Provides Insufficient Evidence to Rebut the Government's Case*

Troy has not presented evidence that justifies this less favorable treatment or more restrictive place of worship standards. To overcome a prima facie case, the City must rebut each comparator with specificity. *Tree of Life III*, 905 F.3d at 373 ("[A] municipality . . . concerned about traffic congestion and noise pollution must project how each particular land use will impact those conditions.").

Troy alleges that "evidence specific to the City of Troy" justifies its unequal treatment, ECF No. 46, PageID.2121-2122, but has provided no such evidence. While it may be true that places of worship do cause some of the negative impacts to which Troy refers—a high number of visitors, traffic influxes during short periods of time, safety considerations due to increased traffic, and nuisances such as increased noise, light, or exhaust fumes—Troy fails to provide evidence as to how exactly these concerns are unique with respect to places of worship and not similar institutions such as schools or banquet halls. *See, e.g.*, ECF No. 46,

PageID.2099; ECF No. 45-11, PageID.1706. And as the Government contends, "common sense belies that cars frequenting places of worship are louder, have brighter headlights, or exude more noxious fumes than those driven to nonreligious events." ECF No. 50, PageID.2894.

Moreover, evidence from Troy's own experience shows that places of worship do not have unique negative impacts on abutting properties. An expert analysis of Troy's property values found that the "adjacency of homes to places of worship with setbacks inconsistent with Troy's current Zoning Ordinance requirements has no impact on home value." ECF No. 50-2, PageID.2923. This finding was consistent with relative property values assigned by Troy's Assessment Department, which ascribed no difference between adjacency to these places of worship as compared with nonreligious assembly uses. *Id.* at PageID.2947. Troy has not submitted evidence to rebut these findings, and the durability of residential property values that closely abut places of worship lacking setbacks or parking consistent with ZO § 6.21 shows that secondary impacts from places of worship do not justify differential treatment. Similarly, if places of worship required more restrictive regulation, one would expect numerous complaints about places of worship with setbacks less than 50 feet or parking within such setbacks related to noise, light, or fumes. But Troy's record of complaints show that the "overwhelming majority" made no reference to such concerns. ECF No. 45-14, PageID.1766.

Finally, the size of certain places of worship in Troy does not justify uniform unequal treatment of all places of worship. Troy claims it has "experience and knowledge of significant historical negative impacts" associated with places of worship, ECF No. 46, PageID.2099, but the portions of the record cited in support refer to a few "mega churches" that are no more similar to Adam than a division one college stadium would be to a

neighborhood soccer field. Additionally, the size of assemblies can be managed with neutral mechanisms such as capacity limitations.

Given that Troy is unable to rebut the Government's prima facie case, the Court grants summary judgment to the Government on its RLUIPA facial Equal Terms challenges.

### C.   RLUIPA Equal Terms As-Applied Claim

Troy argues that summary judgment in its favor is warranted on the Government's RLUIPA Equal Terms claim as it was applied to Adam, *see generally*, ECF No. 46, but this challenge fails as the Court has already found the relevant provisions of the ZO to violate RLUIPA on their face. *See supra*, § III(B). There is therefore, at least, a question of fact as to whether ZO § 6.21 violates RLUIPA as it was applied to Adam. Troy's Motion for Summary Judgment is therefore denied with respect to this claim.

### D.   RLUIPA Substantial Burden Claim

The Government next accuses Troy of placing a substantial burden on Adam's religious exercise by denying Adam's variance application. According to the Government, the variance denial imposed a substantial burden because it "prevented Adam from using the Property as a place of worship, and Adam has no other location where all of its members can come together as one congregation to engage in the full range of religious activities that are central to their faith." ECF No. 53, PageID.2974.

RLUIPA prohibits a municipality from applying a land use regulation "in a manner that imposes a substantial burden on . . . religious exercise" unless it demonstrates that the burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc. Whether Troy's actions imposed a substantial burden on Adam under RLUIPA is a question of law for the Court to decide. *Livingston Christian Sch. v. Genoa*

*Charter Twp.*, 858 F.3d 996, 1001 (6th Cir. 2017) (citing *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 93 (1st Cir. 2013)).

A court's inquiry into whether there was a substantial burden is "functional and factually driven." *Id.* at 1011. A substantial burden is more than a "mere inconvenience," *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007), there must be "some degree of severity [for a burden] to be considered 'substantial.'" *Livingston Christian Sch.*, 858 F.3d at 1001 (citing, among others, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A religious institution can show a substantial burden by demonstrating that (1) it has no "feasible alternative location from which it can carry on its mission"; (2) it has or "will suffer substantial delay, uncertainty, and expense due to the imposition of the regulation," and (3) it did not impose the burden upon itself. *Id.* at 1004 (citations and quotation marks omitted).[7] These are "helpful factors" courts should consider when deciding a motion for summary judgment, but are not necessarily prerequisites to a prima facie case. *Id.* If a Court determines that a substantial burden exists, it may then consider evidence of discrimination or "improper decisionmaking" while evaluating whether the government action was narrowly tailored to serve a compelling state interest. *Id.* at 1005.

### 1.    *Adam Has No Feasible Alternative Location*

The parties dispute whether Adam has a feasible alternative location from which it can practice its desired religious activities. The Government argues that it has been impossible for Adam to find a suitable location that conforms to place of worship standards without requiring special permission from the ZBA. ECF No. 45-3, PageID.1477; ECF No.

---

[7] Unlike it would with an incarcerated person who challenges a prison rule, RLUIPA does not require a plaintiff to show that a land-use regulation compelled it to violate its religious beliefs. *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1003-1004 (6th Cir. 2017).

45-19, PageID.1854. Troy asserts that Adam missed or rejected other property acquisition opportunities in the City and that these locations would have been suitable for Adam's needs. ECF No. 48, PageID.2530. Specifically, Troy refers to potential properties on Coolidge Highway, Maple Street, John R. Road and Long Lake Road. *Id.* at 2530-31. Adam, however, provides evidence that each of these properties were either unavailable or unsuitable. For instance, in 2018, the sellers of the former church on Coolidge Highway refused to sell their building to Adam despite Adam's above-asking price offer to purchase. ECF No. 45-19, PageID.1854. Adam considered the Maple Street property, but it was in an inconvenient location and would have required special use approval due to being located in a residential district. *Id.*; ECF No. 45-4, PageID.1596-97. The wetland conditions of the John R. Street property would have been too difficult for Adam to develop and would have required a special wetland permit. ECF No. 45-19, PageID.1854.  Finally, Adam discussed the Long Lake Road property with a City of Troy employee, but decided not to pursue it since it too was zoned for residential use and would have required a special use permit. *Id.* This undisputed evidence indicates these properties are not feasible alternative locations.

Additionally, and despite Troy's argument to the contrary, ECF No. 48, PageID.2531, the Court finds that the building Adam presently uses is unsuitable for its current and future needs. Adam provides evidence that the basement is not an appropriate space because there is nowhere to complete ritual washing before prayer, the space has no windows and is not accessible for all Adam members, and there is no room for large events or to allow men and women to pray separately, as Islam requires. ECF No. 45-19, PageID.1852. Additionally, the building does not meet the place of worship setback or parking requirements and the record does not support Troy's suggestion that Adam can modify the building to suit its needs.  *Id.*; ECF No. 53, PageID.2975.

Finally, although there may be buildings available for purchase outside of Troy, the City has provided no evidence of these buildings or argument as to why buildings in other communities would be suitable for Adam. The Court also agrees with the Government that Adam requires a convenient central location in Troy due to Islam's requirement of five daily prayers and the spiritual benefits Adam members provide they will receive by praying together in a mosque. ECF No. 45-18, PageID.1847; ECF No. 45-16, PageID.1793. Driving long distances to other communities five times a day is impractical and unnecessary.

The Court also disagrees with Troy's suggestion that Adam members join other mosques in other communities.[8]   *See* ECF No. 48, PageID.2531. Adam's founders state that they seek a building where they can implement their own vision of services and programs and where Adam members can gather together as one Muslim community. ECF No. 45-16, PageID.1793. Establishing a mosque in Troy is therefore central to Adam's mission. *Id.*

The Court therefore agrees with the Government that Adam has no feasible alternative location. This factor weighs in favor of finding that Troy's variance denial placed a substantial burden on Adam's religious exercise.

> 2.      *Adam Has Suffered Substantial Delay, Expense, and Uncertainty as a Result of the Variance Denial*

The Government provides persuasive evidence that Adam has suffered substantial delay, expense, and uncertainty as a result of the variance denial. Adam has searched for a suitable property for many years and purchased the Property at issue here at great cost to its founders and members. *See, e.g.*, ECF No. 45-19, PageID.1854-55; ECF No. 53-1.

---

[8] Although there are approximately 60 places of worship in Troy, there are no permanent mosques devoted to Islamic worship. ECF No. 45-19, PageID.1851.

Adam purchased the Property in 2018 and a group of its members have continued to hold and maintain the Property on Adam's behalf since that time. ECF No. 53-4, PageID.2989. Moreover, Adam was unable to offset its costs by using the building as a restaurant and banquet hall during the COVID-19 pandemic and related financial complications have prevented the restaurant from reopening once state-mandated restrictions were lifted. ECF No. 45-19, PageID.1856.

Troy does not dispute these arguments and provides no evidence to the contrary. Accordingly, the Court finds that Adam has suffered substantial delay, expense, and uncertainty. This factor weighs in favor of the Government. .

### 3.    *Adam's Hardship Was Not Self Imposed*

Troy argues that Adam purchased the Property even though it knew it did not meet the setback and parking requirements of the ZO, therefore any burden it has was self-imposed. ECF No. 48, PageID.2532-34. In support of this argument, Troy relies on a case out of the Fourth Circuit, *Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510 (4th Cir. 2016). In *Andon*, a religious congregation purchased a zoned commercial property for its religious use. *Id.* at 512. Under the relevant zoning ordinance, properties zoned for commercial use could be used as a place of worship only if four conditions were satisfied. *Id.* The property complied with three of the requirements, but did not meet the setback requirement as it was too close to residential properties. *Id.* The congregation had knowledge of this problem and added a contingency to its written lease that would allow it to exit the contract if it did not obtain the required variance. *Id.* at 513. Before a public hearing could be held, the city's compliance department recommended that the congregation's variance application be denied. *Id.* The zoning board later adopted this recommendation and denied the variance. *Id.* Based on these facts, the district court dismissed the congregation's

27

RLUIPA substantial burden claim. *Id.* at 512. On appeal, the Fourth Circuit affirmed finding that "[b]ecause the plaintiffs knowingly entered into a contingent lease agreement for a non-conforming property, the alleged burdens they sustained were not imposed by the [zoning board's] action denying the variance, but were self-imposed hardships." *Id.* at 515.

The present case can be distinguished from *Andon* because here, Adam had a reasonable expectation that its requests would be granted. Unlike in Andon, where the plaintiff had knowledge that the zoning board would likely deny its variance application, *Andon*, 813 F.3d at 513, here Troy reviewed Adam's variance application and allowed Adam to make revisions, but never told Adam that its application would be denied. ECF No. 45-15, PageID.1778; ECF No. 45-19, PageID.1855.

Troy's argument that Adam's burden is self-imposed because Adam knew the Property did not comply with the ZO when Adam purchased the Property is also unsupported by RLUIPA. Knowledge that a property does not comply with a zoning ordinance is not enough, on its own, to defeat a RLUIPA substantial burden claim. If this were the case, no variance applicant could ever establish a substantial burden while also possessing the "ownership interest" RLUIPA requires. *See* 42 U.S.C. §2000cc-5.

Adam's expectation that its variance would be granted was reasonable for several additional reasons, as well. Troy permits places of worship as of right in the district where the Property is located. ZO § 4.14. Adam had no plans to change the parking area or exterior of the building and nearby commercial buildings have similar relevant configurations. ECF No. 45-15, PageID.1779; ECF No. 45-7. Troy had granted variance requests for places of worship in the past and at least 35 places of worship in the City do not adhere to the current place of worship standards. *See, e.g.*, ECF No. 45, PageID.1288. Troy had previously approved of or allowed the Property to be used as a fruit market, haunted house, antiques

and collectibles vendor, shoe store, and most recently, a restaurant with a banquet room, without a zoning variance. ECF No. 45-2, PageID.1373-74. Adam reasonably viewed its proposed use as similar to many of these nonreligious uses. Adam had also secured the support of a neighboring property owner. ECF No. 45-24. Finally, at the hearing on Adam's variance application, Adam addressed each reason why its variance application should be granted and also reminded the ZBA to consider RLUIPA in making its decision. ECF No. 45-22, PageID.1939-44; 1990-91.

Given these facts, the Court finds that Adam's hardship was not self-imposed. This factor weighs in favor of finding a substantial burden.

### 4. Troy Has Not Asserted a Compelling Governmental Interest

Each of the "helpful factors" identified by the Sixth Circuit in *Livingston* indicate that Troy's variance denial placed a substantial burden on Adam's religious exercise. *See Livingston Christian Sch.*, 858 F.3d at 1001. The Court therefore finds a substantial burden in violation of RLUIPA. Accordingly, the burdens of production and persuasion now shift to Troy to show that the substantial burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc.

A "compelling governmental interest" is an interest of the "highest order" that directly affects health and safety. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 221, 230 (1972) (holding that a compelling governmental interest includes abating "substantial threat[s] to public safety, peace or order"). Troy must establish its interest "in the particular case at hand, not . . . in general." *Westchester Day Sch. v. Vill. Of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007). As the Supreme Court explained in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), courts must look "beyond broadly formulated

interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.

Troy argues that Adam was not discriminated against based on its Muslim faith, ECF No. 48, PageID.2534, but otherwise makes no effort to rebut the Government's case by asserting a compelling interest or disputing that it had less restrictive means. *See generally*, ECF Nos. 46, 48, 54. A finding of discrimination is not a requirement to sustain a substantial burden claim, although such a finding is appropriately considered once a substantial burden has been established. *Livingston Christian Sch.*, 858 F.3d at 1005. But whether or not discrimination affected the ZBA's decision is of little consequence here, where Troy has freely admitted that Adam could use the Property to operate a nonreligious "place of assembly," such as a community center, without a variance. ECF No. 45-2, PageID.1374. The Court therefore finds no compelling governmental interest in prohibiting Adam, a religious place of assembly, from operating from the Property.

## IV.   CONCLUSION

RLUIPA was enacted to protect assemblies like Adam from discrimination in zoning laws that "lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" 146 Cong. Rec. 16698 (2000) (joint statement of Sens Hatch and Kennedy). For this and the reasons discussed above, the Court hereby **GRANTS** the United States' Motion for Summary Judgment (ECF No. 45) and **DENIES** the City of Troy's Motion for Summary Judgment (ECF No. 46).

Furthermore, the Court enjoins Troy, its officers, employees, agents, successors and all other persons in concert or participation with it, from enforcing Zoning Ordinance § 6.21(E)-(F) against any religious assembly or institution in districts where nonreligious places of assembly or institutions are permitted as of right or by special approval, or from

enforcing the provision in Zoning Ordinance § 4.21 that permits places of worship only as a specially approved use rather than a by-right use in the Community Facilities district.

**SO ORDERED.**

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 18, 2022

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 18, 2022, by electronic and/or ordinary mail.

s/Lisa Bartlett
Lisa Bartlett
Case Manager